MAM

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| [UNDER SEAL} | : | **CIVIL ACTION NO. 10-CV-1134** |
| | : | |
| Plaintiff | : | **FILED UNDER SEAL** |
| | : | |
| v. | : | |
| | : | |
| [UNDER SEAL] | : | |
| | : | |
| Defendants | : | |

## AMENDED COMPLAINT FOR VIOLATIONS

## OF THE FALSE CLAIMS ACT

**FILED**

SEP 1 1 2012

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

# DO NOT FILE WITH PACER

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* MICHAEL EPP, | : |
| | : |
| | : Civil Action  No. 10-CV-1134 |
| Plaintiff and Relator, | : |
| | : Judge McLaughlin |
| v. | : |
| | : **FILED UNDER SEAL** |
| SUPREME FOODSERVICE AG, SUPREME GROUP B.V., SUPREME FOODSERVICE GMBH & CO.KG, JAMAL AHLI FOODS CO. LLC, STEPHEN ORENSTEIN, and RASTELLI FOODS, | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : **DO NOT PUT ON PACER** |
| Defendants. | : |

## AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

### I.   INTRODUCTION

1.     Relator Michael Epp, by his counsel, Morgan Verkamp LLC and Pietra-gallo Gordon Alfano Bosick & Raspanti, LLP, brings this action on his own behalf and on behalf of the United States of America to recover damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.,* against Defendants Supreme Food Service AG, Supreme Group B.V., Supreme Foodservice GmbH & Co.KG, Jamal Ahli Foods Co. LLC d/b/a JAFCO, Stephen Orenstein and Rastelli Foods.  The violations arise out of false claims for payment and other unlawful conduct in connection with a contract between Supreme Foodservice AG and the United States in which Supreme promised to distribute food and other items to United States military locations in Afghanistan.  Mr. Epp also brings personal claims for retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h), and for breach of contract.

## II.   JURISDICTION AND VENUE

2.     This Court has subject-matter jurisdiction pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

3.     Venue is proper in this District under 28 U.S.C. § 1391, as defendants do business in the Eastern District of Pennsylvania.

4.     The facts and circumstances of the False Claims Act violations alleged in this complaint have not been publicly disclosed in a criminal, civil or administrative hearing, nor in any congressional, administrative, or government accounting office report, hearing, audit investigation, or in the news media.

5.     Mr. Epp is an original source of the information upon which this complaint is based, as that term is used in the False Claims Act.

6.     Relator disclosed the allegations of this complaint to the United States prior to its filing.

## III.   PARTIES

7.     The real party in interest to the claims set forth herein is the United States of America.

8.     Relator Michael Epp is a German citizen.  He has a Master's Degree in logistics and supply chain management, and has worked in that field since attaining his degree in 1982.  Among other positions, he worked as Vice President, Purchasing & Supply Chain, North America for The Dannon Company, Inc. from 1999 to 2002, with responsibility for $400 million in purchasing and $50 million in logistics.

9.     Relator was employed by Supreme Foodservice AG ("Supreme") as

-2-

Director, Commercial Division and Supply Chain, beginning in April 2004. Mr. Epp has also been employed by Supreme Foodservice GmbH & Co.KG. His workplace was in Dubai, United Arab Emirates. He was hired by Supreme's principal owner, Stephen Orenstein, as Director, Commercial Division, to lead a joint venture between Supreme and Sodexho to develop the African market, with Sodexho providing catering services and Supreme providing logistical support.

     10.    By early to mid-2005, it was apparent that the Sodexho joint venture was not going to work. On Mr. Epp's recommendation, it was halted and Mr. Epp was made Manager of Supreme's Transportation Division in Dubai.

     11.    In June 2005, Supreme was chosen by the Department of Defense to serve as Prime Vendor for U.S. forces in Afghanistan. Although he had no involvement in the bid process, Mr. Epp was assigned to develop and manage the supply chain for the Prime Vendor contract.

     12.    Mr. Epp had no experience or training in government contracting prior to June 2005. He understood his responsibility to be to develop a supply chain which delivered required goods at the lowest cost possible while maximizing Supreme's profit. Supreme's business model, imparted to Relator by Orenstein, was to bid low on the assumption that additional revenue sources could be identified after a contract was obtained from the Government.

     13.    In early 2007, Mr. Epp advised Orenstein that Supreme would have to refund money to the Defense Department because it had overcharged for transportation fees. He was summarily terminated on March 6, 2007, but was told he would be

-3-

kept on the payroll for six months as required by German law.  Defendant Orenstein subsequently learned that Mr. Epp was exploring the possibility of bringing a *qui tam* case.  His compensation was stopped and Supreme sought to have his work permit rescinded, which would have resulted in his expulsion from the country.  Supreme then agreed to substantial severance payments for Mr. Epp, but in late 2010, reneged on its contractual obligation, in violation of the anti-retaliation provision of the False Claims Act.

14.    Supreme Foodservice AG is a Swiss corporation with its principal place of business at Ziegelbruckstrasse, CH-8866 Ziegelbrucke, Switzerland.  It is owned by Supreme Group BV, now headquartered in the Netherlands, which also owns Supreme Foodservice AG (based in Switzerland), and Supreme Foodservice GmbH & Co.KG and Supreme Consulting GmbH (both based in Germany).  It also established and controls JAFCO, a UAE corporation that it used to engage in the fraudulent activities herein. During the conduct alleged in this Amended Complaint, Mr. Epp has been alternately employed by Supreme and Supreme Foodservice GMBH & Co.KG, which Defendants acted in concert, together with Defendants Orenstien and Supreme Group B.V. The fraudulent actions alleged in this Amended Complaint were orchestrated at his direction and control by the Supreme Defendants and JAFCO, and resulted in injury to the public fisc.

15.    Supreme maintains an office in or near Reston, Virginia, and launched a division called "Supreme U.S.A." in 2009.

16.    Supreme was founded in 1957 by Alfred Orenstein, identified by the

-4-

company as "a former U.S. Army food service soldier."  Supreme is controlled by defendant Stephen Orenstein, who is its majority shareholder and who exercises day-to-day control over the operations of Supreme.  Orenstein, an American citizen, is deeply involved in the day-to-day operations of Supreme Foodservice and was Relator's principal contact during his employment with the company.  The only other shareholder known to Mr. Epp is Michael Jacque Gans, an attorney licensed to practice in New York who lives in Switzerland.

17.     Rastelli Foods, d/b/a Rastelli's Fine Foods, is a privately-held company headquartered in New Jersey which has been defendant Supreme's principal American supplier of manufactured food items purchased by Supreme for shipment to Afghani-stan in fulfillment of its Prime Vendor contract.  Rastelli Foods conspired with Supreme and the Iraq Prime Vendor, Public Warehousing Company K.S.C. ("PWC"), to take unlawful markups and pay unlawful rebates which were not disclosed to the United States, in order to obtain and increase Rastelli's Prime Vendor business.

## IV.    FACTS

### A.    BACKGROUND

18.     On or about September 3, 2004, The Defense Supply Center Philadelphia ("DSCP") issued an SF 1449 Solicitation/Contract/Order for Commercial Items seeking Defense Department acquisition for "full-line food and non-food distribution for author-ized customers in the Middle East Zones" as defined in the document.

19.     The Solicitation, No. SPM300-04-R-0323, sought to contract with distribu-tors who would act as Prime Vendors ("PV's") responsible for supplying adequate

quantities of food to U.S. military facilities in war zones.

20.     The solicitation identified five zones for which the government intended to make awards. Zone 1 encompassed Kuwait, Iraq, and Jordan; Zone 2, the United Arab Emirates (UAE) and Oman; Zone 3, Afghanistan; Zone 4, Bahrain, Qatar, and Saudi Arabia; and Zone 5, Djibouti.

21.     On or about June 3, 2005, Supreme Foodservice AG was selected by DSCP as Prime Vendor for Zone 3, Afghanistan. The resulting Contract No. SPM300-05-D-3130 states an award amount of $217,863,938 for an initial 18-month ordering period, but including three option periods after the 18-month "Base Year" was worth up to as much as $1 billion.

22.     This was the first Prime Vendor contract issued by the United States for delivery into Afghanistan. From 2001 through most of 2005, the Army serviced the Afghan theater, as it had traditionally done in prior conflicts.

23.     This was also the first Prime Vendor contract sought or obtained by Supreme. Supreme had never contracted with the Defense Department prior to this selection process, but had a similar contract for International Security Assistance Force ("ISAF") coalition partners, to include Great Britain, Germany, and Italy, delivering foodservice items to their forces deployed in Afghanistan.

24.     To assist Supreme in its attempt to obtain the Prime Vendor contract, Supreme hired Joseph Alvarez, who was until 2004 a Major in the United States Army and Chief of Subsistence Foodservice for DSCP in Europe. On information and belief, Alvarez now lives in Zurich and remains employed by Supreme.

25.    Mr. Alvarez was titled "Director, U.S. Department of Defense Division" of Supreme Foodservice AG.

26.    Supreme further sought to maximize its chance of being selected as the Afghanistan Prime Vendor by contracting with the Iraq Prime Vendor, Public Ware-housing Company K.S.C. ("PWC") and Professional Contract Administrators, Inc. ("PCA") for consulting services.  In exchange for these consulting services, Supreme promised to pay the PWC/PCA team 3.5% of Supreme's net revenues under the Prime Vendor contract, denominated a "Monthly Service Fee" in these parties' October 25, 2004 Services Agreement.

27.    The Services Agreement required PWC to impart to Supreme PWC's accumulated knowledge regarding performance under a Prime Vendor contract.

28.    In order to enhance Supreme's attractiveness as a Prime Vendor, the bid which Supreme submitted was based on low distribution fees.  Relator believes that had the stated distribution fees been Supreme's only profit under the Prime Vendor contract, Supreme would have lost money on the contract.

29.    A contract amendment dated September 14, 2005 confirmed that Su-preme would commence operations under the contract on December 5, 2005, with first deliveries made on December 11, 2005.  The amendment of September 14, 2005 changed the number of the contract to SPM300-06-D-3130, and an amendment dated October 1, 2006 changed the number of the contract to SPM300-07-D-3130.

30.    The prime vendor contract provided that pricing for each product delivered would be based on the formula, "Unit Price = Delivered Price + Fixed

-7-

Distribution Price."  The "Unit Price" was defined as the total price (in U.S. currency) that was charged to Defense Supply Center Philadelphia ("DSCP") per unit for a product delivered to the Government.

31.     The contract defines price terms.  The "Delivered Price" is the manufacturer's or supplier's "actual invoice price" to deliver a product to the prime vendor's distribution point, whether in the continental United States ("CONUS") or outside the continental United States ("OCONUS").

32.     The "Fixed Distribution Price" is a firm fixed price which represented all parts of the price of an item other than the unit price, and accounted for Supreme's overhead, profit, packaging costs, etc.  It was to remain constant for each particular item for the base period and subject to agreed adjustments in the option years.

33.     Supreme's "Fixed Distribution Price" did not vary with the price of an item. Thus, whether the price of dried eggs or candied yams went up or down, the amount which Supreme was paid for its role in sourcing and delivering them did not.

34.     As the Prime Vendor contract was originally conceived, DoD's Defense Transportation System ("DTS") was to be used to transport product to overseas distribution points. Transportation costs were not figured into the Delivered Price. However, it quickly became apparent that the Prime Vendors would be responsible for substantial ground, air, and sea transport, something for which the Prime Vendor Contract did not set prices.

35.     Within weeks of learning that Supreme had been awarded the Prime Vendor Contract for Afghanistan, Defendant Orenstein began working to maximize his

company's profits thereunder.  This complaint identifies a variety of schemes which were used to accomplish that goal.

### B.   SUPREME SYSTEMATICALLY FAILED TO GIVE THE UNITED STATES THE BENEFIT OF DISCOUNTS IT NEGOTIATED WITH SUPPLIERS

36.   Rebates and discounts are routinely negotiated in the highly-competitive food service industry.  The Department of Defense requires that it be afforded the benefit of all such rebates or discounts.

37.   Solicitation SPM300-04-R-0323 provided, at ¶ 24 under the heading "REBATES/DISCOUNTS," that:

> Rebates and discounts are to be returned to DSCP when they are directly attributable to sales resulting from orders exclusively submitted by DSCP or its customers . . . The discount/allowance shall be reflected via a reduced STORES [ordering system] price, resulting in a lower invoice price to the customer.

38.   By accepting the terms of the Solicitation, Supreme promised that the United States would receive the benefit of all rebates and/or discounts resulting from product purchases.

39.   The Solicitation also required Prime Vendors to have a plan in place for returning all rebates, discounts, and allowances to the Government.

40.   Supreme regularly negotiated discounts with its suppliers in the continental United States ("CONUS") without informing the United States of its actions and without discounting its invoices to DSCP.

41.   Supreme and its vendors called these negotiated cash discounts "Prompt Payment Terms."  In fact, however, Supreme rarely paid "promptly."  Suppliers were paid a weighted average of 48 days after shipment of the products, with actual payment

periods ranging from 20 to 120 days and (not including Supreme front company JAFCO) an average "prompt pay" period of 46 days.

42.     Based on his lengthy experience in the food service industry, Mr. Epp knew that prompt payment terms were usually a small amount (generally two or three percent) contingent on payment in a short time (usually seven to ten days).

43.     Supreme learned of the "Prompt Payment" scheme from what became its largest vendor, Rastelli Foods Group.

44.     In June 2005, Relator, Supreme owner Stephen Orenstein, and Joseph Alvarez attended a post-award meeting in Atlantic City, New Jersey. They met a number of would-be suppliers for the obviously-lucrative Afghanistan Prime Vendor contract.

45.     One attendee was Anthony Rastelli, principal of Rastelli Foods Group of Swedesboro, New Jersey.  Rastelli was already a principal supplier to PWC, the Prime Vendor for American military operations in Iraq.

46.     Rastelli invited the Supreme team to his facility in Swedesboro, New Jersey, to meet further.

47.     At that meeting, Orenstein pressed Rastelli for information regarding the manner in which the Prime Vendor for Iraq, PWC, did business.

48.     Rastelli removed the meeting from a conference room into his private office. There, he described to Supreme the system of "prompt payment" discounts and consolidation fees paid by its suppliers, which allowed the participants in the Prime Vendor process to make profits beyond the fixed fee provided for in the Prime Vendor

contracts.

49.     On June 25, 2005, Anthony Rastelli sent an e-mail to Supreme minority

owner Michael Gans and DOD Director Joseph Alvarez, which was forwarded to

Orenstein and then to Relator, which stated:

> I would like to thank you and your team for taking the time
> from you[r] busy schedule to visits (*sic*) with Rastelli's. I look
> forward to helping Supreme become a very profitable and
> successful Prime Vender in the Middle East. As of June 25th
> Supreme has 10 million open receivables with 35 days
> payment terms (5% prompt pay) from Rastelli Foods. Please
> feel free to call me if I can be of any assistance.

50.     Further negotiations resulted in Rastelli agreeing to an across-the-board

8% discount to Supreme, with a 60-day "prompt" pay provision.

51.     After this meeting, Orenstein and Alvarez directed Relator to deploy the

Rastelli model to obtain discounts from other suppliers.  In an e-mail dated July 7,

2005, Alvarez told Orenstein and Relator that the pricing "goal [is] at least 5% prompt

payment to PWC if we are allowed to ship items commercially to Kabul" (emphasis in

original), and the "goal using DTS should be 8% prompt payment."

52.     Although Supreme's Director of U.S. Defense Department Operations

Alvarez was present at this meeting and participated in subsequent discussions re-

garding discount issues, this discount scheme was not disclosed to the United States.

53.     A "prompt pay" discount of 8% for payment within two months is not

commercially reasonable.

54.     The Rastelli "discount" was actually an illegal kickback to Supreme in

exchange for its business on the Afghanistan Prime Vendor contract.

55.    On or about August 3, 2005, Relator sent a letter to all CONUS suppliers

advising them that to do business with Supreme as Prime Vendor,

> 120 days payment terms *combined with a cash discount* are mandatory;
> please indicate in writing if you can't comply with this requirement as this
> will unfortunately exclude your company of becoming a vendor under our
> contract.

Emphasis supplied.

56.    The resulting cash discounts ranged from four to nine percent of the total

invoice price, with an average discount from CONUS vendors of six percent.

57.    Because the 8% discount offered by Rastelli was higher than most,

Supreme purchased as much as possible from Rastelli.  The result was that Rastelli

supplied 51% of Supreme's CONUS purchases.

58.    By negotiating discounts and then billing the United States at full price,

Supreme substantially increased its revenues over what its contract allowed.

59.    Supreme realized approximately $6 million in unlawful profits in 2006 by

pocketing the discounts or rebates it negotiated with its CONUS vendors.

60.    Supreme also realized approximately $2 million in unlawful discount/

rebate profits for the last two months of 2005.

61.    When Relator was fired by Supreme in 2007, this practice was ongoing.

62.    On February 26, 2006, Rastelli owner Anthony Rastelli advised Supreme

that it was reducing its "prompt pay" discount from 8% to 5% and imposing consolida-

tion fees on many items.

63.    Relator immediately complained that Rastelli's "dramatic change in the

concept of pricing has a huge impact on the profitability of the business."

-12-

64.     Rastelli responded by e-mailing that "the pricing I have sent through is audit proof and we will be called for audit shortly!"

65.     On February 28, 2006, defendant Rastelli advised Supreme's Armin Schroeder that he had "lowered the distribution fees" on certain products "to 5% since I have a 5% program on my side with these companies.  This means that I am delivering there [sic] products at manufactures [sic] cost" because of Supreme's 5% discount.

66.     In other words, defendant Rastelli's suppliers–in this case manufacturers Campbell's, Quaker Oats, and Kellogg's–were themselves hiding a discount to Rastelli in their pricing so that Rastelli could create the appearance of delivering to Supreme at manufacturer's cost (as required by the Prime Vendor contract).

67.     One of myriad examples of Rastelli's manipulation of pricing in order to disguise discounts at the expense of the United States occurred in March 2006 and related to the sale of French fried potatoes, NSN 891501E950170.  On or about October 11, 2005, the Lamb Weston unit of Con Agra invoiced Rastelli Fine Foods $15,458.40 for 1,140 24-unit cases of French fries at a price per case of $13.56.  Lamb Weston offered Rastelli an apparently-legitimate prompt payment discount of 2% for payment in 10 days.

68.     Rastelli then sold the product to SFS at a delivered price of $17.40 per case–an increase from the price paid by Rastelli *before* discount of $3.84 (29%).

69.     Rastelli then provided Supreme a discount of 8%.

70.     The DSCP Catalog Price for these fried potatoes, which was input by Supreme, was $17.38 per unit.  The combined excess profit of Rastelli and Supreme on

-13-

one shipment of one item was, therefore, almost $4,000.  Even after remitting a prompt

payment" discount to defendant Supreme, defendant Rastelli was left with a substantial

additional margin which was not disclosed to the United States.

71.    Orenstein pressured Relator and others involved in purchasing products

for the Prime Vendor contract to favor those vendors who agreed to the largest cash

discounts.

72.    By knowingly failing to disclose and keeping discounts in violation of

contract terms and standard commercial practices, Supreme knowingly violated the

terms of its Prime Vendor contract and the False Claims Act.

73.    Supreme's claims seeking reimbursement for amounts in excess of

manufacturer's prices for product violated the False Claims Act.

### C.    SUPREME USED A CORPORATION OWNED BY SUPREME INSIDERS AS A MIDDLEMAN, RESULTING IN A SUBSTANTIAL UNLAWFUL MARKUP ON LOCAL MARKET READY ITEMS

74.    Items that could not be purchased in the United States, such as fresh

fruits and vegetables, were to be purchased from approved local suppliers.  The term

used to refer to these items is "Local Market Ready" ("LMR").

75.    Supreme contracted with the United States to provide LMR items to

include such things as fresh produce (called Fresh Fruits and Vegetables, known as

"FF&V"), soft drinks, dairy products, and baked goods.

76.    Supreme sourced most LMR items in the UAE, where Mr. Epp was

located.

77.    In attempting to reason through the logistics of a supply chain for LMR,

Mr. Epp concluded that it was necessary to involve some form of consolidator in the UAE. He prepared a PowerPoint presentation in July 2005 which discussed the possibility of using a distinct entity, whether owned by Supreme or not, for purposes of consolidating LMR items for shipment to Afghanistan.

78.     Joseph Alvarez cautioned that Supreme could not own this entity, saying that "Supreme can't buy from Supreme."

79.     In August 2005, notwithstanding Alvarez's advice, Supreme's shareholders established Jamal Ahli Foods Co. LLC ("JAFCO"), at Sharja, UAE to provide LMR items.

80.     Supreme's Orenstein concealed the ownership of JAFCO by putting it in the name of Supreme Dubai's sponsor, Dr. Jamal Ahli, and the wife of Supreme Dubai's Director. They held 51% and 49% of the JAFCO's shares respectively. JAFCO was completely controlled by Supreme, and its General Manager reported to Relator.

81.     In September 2005, by means of an SF30 Amendment of Solicitation/Modification of Contract submitted to DSCP, Supreme advised the Department of Defense that it intended to use JAFCO as an "additional place of performance for Local Market Ready support."

82.     JAFCO turned out not to be the staging contractor Mr. Epp had envisioned. Rather, Orenstein directed that it be used as a *de facto* vendor to dramatically mark up LMR items. Even though JAFCO was an *alter ego* of Supreme, JAFCO purchased LMR product and then "sold" it, at an increased price, to Supreme. Supreme billed the United States as though it had purchased the product at the price it

-15-

paid JAFCO.

83.     JAFCO's management reported to Mr. Epp, and all operations of JAFCO

were controlled by Supreme.

84.     An August 31, 2005 Excel spreadsheet generated by Supreme personnel

demonstrates how Supreme profited through the use of JAFCO:

| Description | Invoice Price Supplier | Charge from JAFCO to SFS | % Margin Product |
|---|---|---|---|
| B R, ICE CREAM,  FZN, PRALINES N CREAM, 3 GAL CO | $38.12 | $43.83 | 15% |
| B R, ICE CREAM, STRAWBERRY, FZN, W/STRAWBERRY PIECES & SWIRL, 3 GAL CO | $38.12 | $43.83 | 15% |
| B R, ICE CREAM, VANILLA, FZN, 3 GAL CO | $38.12 | $43.83 | 15% |
| TOPPING CARAMEL SAUCE, 24/1 kg | $71.88 | $93.44 | 30% |
| TOPPING CHOCOLATE FUDGE, 24/1 kg | $65.34 | $84.95 | 30% |
| TOPPING STRAWBERRY SAUCE, 24/1 kg | $71.88 | $93.44 | 30% |
| BEER, NON-ALCOHOLIC, GERMAN 24/330 ML CN | $8.30 | $18.68 | 125% |
| ICE CUBS, FZN, 5 LB BAG | $0.11 | $0.16 | 50% |
| BEV, CARB, 7UP, 24/300 ML CN/CS | $4.36 | $5.66 | 30% |
| BEV, CARB, COCA COLA, 24/330 ML CN/CS | $4.40 | $5.72 | 30% |
| BEV, CARB, DIET COKE, 24/330 ML CN/CS | $4.40 | $5.72 | 30% |
| BEV, CARB, DIET PEPSI, 24/300 ML CN/CS | $4.36 | $5.66 | 30% |
| BEV, CARB, FANTA ORANGE, 24/330 ML CN/CS | $4.40 | $5.72 | 30% |
| BEV, CARB, FANTA STRAWBERRY, 24/330 ML CN/CS | $4.40 | $5.72 | 30% |
| BEV, CARB, MIRANDA, 24/300 ML CN/CS | $4.36 | $5.66 | 30% |
| BEV, CARB, MOUNTAIN DEW, 24/300 ML CN/CS | $4.36 | $5.66 | 30% |
| BEV, CARB, PEPSI COLA, 24/300 ML CN/CS | $4.36 | $5.66 | 30% |
| BEV, CARB, SPRITE, 24/330 ML CN/CS | $4.35 | $5.66 | 30% |
| DRINK, ENERGY, RED BULL 24/250 ML CN/CS | $23.58 | $29.48 | 25% |
| JUICE, APPLE 24/200ML CO/CS | $3.21 | $4.98 | 55% |
| JUICE, COCKTAIL 24/200 ML CO/CS | $3.21 | $4.98 | 55% |
| JUICE, ORANGE 24/200 ML CO/CS | $3.21 | $4.98 | 55% |
| JUICE, PINEAPPLE, 24/200ML CO/CS | $3.21 | $4.98 | 55% |
| MILK WHITE, UHT, LOW FAT, 24/200 ML CO/CS | $3.27 | $5.06 | 55% |
| MILK, CHOCOLATE, UHT, 24/200 ML CO/CS | $3.59 | $5.57 | 55% |
| MILK, FLAVORED, BANANA, UHT, 24/200 ML EA CS | $3.59 | $5.57 | 55% |
| MILK, STRAWBERRY, UHT, 24/200 ML CO/CS | $3.59 | $5.57 | 55% |
| SNACK, POTATO CHIPS, CATSUP 48/1.4 OZ PG/CS | $15.44 | $19.30 | 25% |
| SNACK, POTATO CHIPS, CHEESE, 48/1.4 OZ PG/CS | $15.44 | $19.30 | 25% |
| SNACK, POTATO CHIPS, CHILI, 48/1.4 OZ PG/CS | $15.44 | $19.30 | 25% |
| SNACK, POTATO CHIPS, ORIGINAL, 48/1.4 OZ PG/CS | $15.44 | $19.30 | 25% |
| SNACK, POTATO CHIPS, SALT & VINEGAR 48/1.4 OZ PG/CS | $15.44 | $19.30 | 25% |
| SNACK, DORITOS, NACHO CHEESE, 48/ 1.58 OZ PG/CS | $17.40 | $23.49 | 35% |
| ICE CREAM BAR, MARS, 24 EA / 62.5 ML | $10.89 | $13.61 | 25% |
| ICE CREAM BAR, SNICKERS, 24 EA / 56 ML | $10.89 | $13.61 | 25% |

| | | | |
|---|---|---|---|
| ICE CREAM BAR, TWIX, 24 EA / 60.5 ML | $10.89 | $13.61 | 25% |
| ICE CREAM, COOKIES AND CREAM, FRZ, 150 ML CUP, 12/CASE | $9.07 | $11.33 | 25% |
| ICE CREAM, DOUBLE CHOC, FRZ, 150 ML CUP, 12/CASE | $9.07 | $11.33 | 25% |
| CHOCOLATE SHAVING, 6 x 500 g | $90.00 | $121.50 | 35% |
| ICE CREAM CONES, FRESH, 672/11,5 GR AVG | $74.00 | $99.90 | 35% |

85.    These examples relate to items which were shipped by sea.  FF&V

airlifted into Afghanistan was marked up an average of 32%.

86.    On September 5, 2005, Relator e-mailed defendant Orenstein regarding

"P & L ["Profit & Loss"] US contract:"

> Airlift cost have been calculated very conservatively with 25% fill rate and
> an extra cost mark up of 25% for risk.  I have no idea about the distribu-
> tion cost in Kabul, this needs to be taken into account as well as all the
> overhead invested in that project.  So, please don't take that as the final
> figure but as a good indication of gross margin.  I'll not distribute/ com-
> municate such figures to anybody as this may be completely mi-
> sunderstood, think you agree.

87.    On September 14, 2005, Stephen Orenstein responded to Relator's e-

mail, saying "I would like to review the LMR mark-up before JAFCO makes its first

shipment."

88.    Supreme, under the close supervision and tutelage of owner Orenstein,

used the fiction that JAFCO was an arms-length supplier to maximize Supreme's

revenues.

89.    Supreme also used the JAFCO fiction as a means of manipulating prices

to the United States so that, rather than reflecting what was actually paid, they were at

parity with the prices charged by PWC.

90.    For example, in February 2006, Orenstein sent an e-mail to Relator,

Alvarez, and purchasing manager Armin Schroder complaining about non-alcoholic

-17-

beer pricing.

91.     Orenstein wrote: "The revised sales price is somewhat lower than the price submitted by PWC for the same product.  Why can't we submit the same cost price as PWC did? . . . If a lower product cost is likely to increase revenue [due to high shipping costs] then we should go with option 1."

92.     The result of defendant Orenstein's directive to "go with option 1" was that Supreme charged the United States a 125% markup on nonalcoholic beer.

93.     Supreme used a variety of means to learn PWC's pricing, and Supreme's primary goal, especially with respect to LMR items, was to ensure that its pricing was consistent with PWC's.  Much of Supreme's information about PWC prices came from the two companies' mutual consulting firm, PCA.

94.     Orenstein and Alvarez were directly involved in the use of JAFCO to create false profits.  For example, on March 14, 2006, Relator e-mailed Alvarez and Orenstein regarding pricing on several items.  The e-mail states "Gents, Do you agree with the following pricing, I'd like to get that out today," and reproduced this spreadsheet in the body of the message:

| SR # | Item | Purchase Price (US$) | Seven Seas quotes | Seven Seas price to customer | Supreme sales price | Mark Up |
|------|------|---------------------|-------------------|------------------------------|---------------------|---------|
| 1 | TRAY,MESS,COMPARTMENTED "5 COMP. PAPER PLATES" | $70 | $80 | $105 | $103 | 47.14% |
| 2 | BAG,PLASTIC "55 GALL" | $38 | $75 | unknown | $70 | 84.21% |
| 3 | CAN TRASH 55 GALL | $55 | $100 | unknown | $95 | 72.73% |

| 4 | CLEANER POLISH  ECOLAB 17oz | $46 | $57 | unknown | $69 | 50.00% |
|---|---|---|---|---|---|---|

95.    While DSCP rejected these prices, which related to disposable items outside the LMR contract for which DSCP requested pricing, the exchange typifies Supreme's approach to pricing.

96.    Among Relator's duties assigned by Orenstein was to ensure that JAFCO's role as wholly-owned middleman was opaque.  On March 13, 2006, Supreme partner Michael Jacques Gans, who is licensed to practice law in New York, e-mailed Relator, saying "as a matter of extreme urgency I would like to review the details of the JAFCO business model/pricing model.  That will entail analyzing precisely what work JAFCO performs and what charges it makes for each element – so as to determine the defensibility of its charges."

97.    In an e-mail later on the same day, Relator responded to Gans and Orenstein that several tasks relating to JAFCO's role would be undertaken, to include "defin[ing] in small detail the service JAFCO is providing and thus product/category group by product/category" and "[r]eview of service provided and related mark up applied to product."

98.    Relator tasked the general manager of JAFCO to list all JAFCO activities and assign costs to them.  However, there was little to itemize, because most activities were already paid through other charges (primarily those related to packing produce in corrugated-paper containers, called "triwalls").

99.    Six weeks later, on April 26, 2006, Gans wrote:  "Michael, perhaps the heat is off regarding JAFCO – but was all that was listed [in the prior e-mail of March

-19-

13, 2006] done?  If so, I would really like to see it."

100.   In fact, Supreme's owners had no interest in revising the manner in which JAFCO did business, and gave Relator no direction to do so.

101.   Supreme's FF&V pricing was in some cases facially unreasonable.  In May 2006, DSCP noted that Supreme's prices for FF&V were "aberrantly high," with corn priced at 525% of a competitor; Radishes, 723% higher; Avocados 311% higher; and Grapes, 81% higher.

102.   In response, Supreme blamed the high prices on the decision to supply produce of exceptional quality.  Supreme offered to provide inferior produce, asserting that "the savings are app. 100-400%, but we think it is very difficult now to convince the customer to take a product with much lower quality, as they are used to the current product quality already for 6 months."

103.   Both Orenstein and Alvarez were fully engaged in these communications. Indeed, immediately after DSCP inquired about the aberrant pricing, Alvarez e-mailed Orenstein and Relator, saying "This is not very nice.  I think it is time to raise distribution fees."

104.   On the next day, Orenstein directed Relator to "get up-to-date FFV prices from PWC[.]"

105.   Over the next few weeks, Supreme worked to find an alternative vendor for certain of the items regarding which DSCP complained, and ultimately offered a lower price.  However, Supreme did not end its practice of using JAFCO to buy product and then adding an extreme markup.

106.   Supreme never advised DSCP that one of the reasons for its high prices was the use of a captive middleman to illegally boost profits.

107.   In the spring of 2006, Relator participated in a conversation with Orenstein and Alvarez in which Orenstein decided to give JAFCO a "meaning" by opening a warehouse for beverages and bottled water (called JAFCO2). The premise was that if JAFCO warehoused a stockpile of beverage items, it would be easier to justify the markups for those beverages than if JAFCO alone was involved as a middleman.

108.   JAFCO2 stockpiled soft drinks from May 2006 forward, despite the fact that local bottlers of both Coca-Cola and Pepsi products were fully able to fulfill Supreme's orders anytime with fresh product, so the stockpile (and JAFCO2 itself) was wholly unnecessary.

109.   Some of the product warehoused at JAFCO2 actually passed its expiration date without ever being delivered.

110.   In July 2006, Relator communicated to Stephen Orenstein by e-mail regarding "the further organization of JAFCO." The e-mail highlights growing concerns regarding a "'security risk'" posed by JAFCO personnel "having full visibility of agreements and margins," and proposes:

> Sales: (only DoD): sales prices will be fixed by CPD based on purchasing price plus mark up, prices to be fed into JAFCO BW system and used for invoicing, nobody in JAFCO knows mark up nor purchasing price.

111.   In December 2006, Mr. Gans reported to his partner Orenstein and Supreme's DoD representative, Joseph Alvarez, that he had obtained advice from an

American lawyer validating the JAFCO arrangement.  However, Relator knows that

Gans, who is a 25% owner of Supreme, did not know the full details of the JAFCO

arrangement for purposes of providing a complete description thereof in seeking advice

of counsel.

112.   On or about January 16, 2007, Armin Schroeder, Supreme's purchasing

manager,  sent Relator an e-mail, "Subject: Purchasing/Selling JAFCO Total 2006."

The e-mail attached a spreadsheet entitled "Mark up 2006.xls," and included this

information (relating only to FF&V items shipped by air):

Michael, As requested:

JAFCO Total:

Buying:          12.424.928 USD
Selling:         19.160.914 USD
Margin:          6.735.986 USD (35%)

Fruits:
Buying:          7.359.658 USD
Selling:         11.696.535 USD
Margin:          4.336.877 USD (37%)

Vegetables:
Buying:          5.065.270 USD
Selling:         7.464.379 USD
Margin:          2.399.109 USD (32%)

113.   Supreme's markups as a result of its use of JAFCO include 15% for ice

cream, 30% for carbonated soft drinks, and 55% on juice, milk, and lettuce.

114.   Additional examples include:

Coca Cola, 24 bottles x 330 ml
Purchase price from UAE bottler: $4.40 per case
Supreme purchase price from JAFCO: $5.72 per case
Amount billed to United States: $5.72 per case plus distribution fee

Orange juice,  24 cartons x 240ml
Purchase price from UAE packager: $3.21 per case
Supreme purchase price from JAFCO: $4.98 per case
Amount billed to United States: $4.98 per case plus distribution fee

Iceberg Lettuce, purchase price from importer: $1.25 per pound
Supreme purchase price from JAFCO: $1.94 per lb.
Amount billed to United States: $1.94 per pound plus distribution fee

115.   Iceberg Lettuce was the largest-volume FF&V item Supreme sold to the

United States, with 720,000 pounds shipped in 2006.  Thus, is 2006 alone, Supreme

realized fraudulent profit of a half-million dollars on head lettuce.

116.   Coca-Cola and PepsiCo products and orange juice were loaded into

shipping containers at the factory, and JAFCO provided no service other than invoicing.

117.   Across Supreme's business lines, JAFCO generated revenue of €132

million (approximately $171.6 million USD) in 2006, resulting in gross profit of €24.6

million (approximately $30 million USD).  However, JAFCO paid Supreme "service

fees" and "lost cash discounts" which exceeded JAFCO's profits and resulted in a net

loss to JAFCO of €416.  That is, Supreme's owners sucked all profit out of JAFCO as

their own.  Most or all of that $30 million reflected fraudulent profit to Supreme based

on the bogus JAFCO arrangement.

118.   In connection with the DoD contract to supply food into Afghanistan,

Supreme realized excess gross profits in 2006 alone of $13.5 million as a result of the

use of JAFCO as a middleman for LMR.  Of this amount, $7.5 million related to airlifted

LMR, and $6 million resulted from LMR shipped by land or sea.

119.   The use of JAFCO as an illegal middleman was in full force and effect

when Mr. Epp was terminated by Supreme, and on information and belief continued

through the life of the contract.

### D.  SUPREME INFLATED PRICING FOR BOTTLED WATER, IN KNOWING VIOLATION OF ITS CONTRACT WITH THE UNITED STATES

#### 1.  Water Pricing

120.  As noted, the United States Army was responsible for managing the food products in Afghanistan prior to Supreme's prime vendor contract.  Though managed by the Army, the area was also covered for certain products through a contract with PWC.

121.  PWC contracted to supply bottled water to U.S. forces in Afghanistan before Supreme was chosen as Afghanistan Prime Vendor.  However, PWC was unable to perform.  In October 2004, Supreme's freshly-hired DSCP negotiator, Joseph Alvarez, negotiated with PWC for Supreme to subcontract bottled water requirements into Afghanistan.

122.  Beginning in October 2004, Supreme received orders from PWC and managed the supply chain.  Supreme invoiced DSCP through PWC at a rate of $6.45 per 24-bottle case of .5 liter bottles.  This rate was much higher than Supreme's actual cost in purchasing and transporting the water and thus provided a substantial profit for Supreme.

123.  Relator does not know how Alvarez originally justified the $6.45 price for water, but believes that Alvarez likely presented to DSCP the manufacturers' invoices at real cost and justified the additional rate through transportation costs.  Alvarez knew that DSCP would have a difficult time checking the real cost of logistics.

124.  PWC also collected the Distribution Fee of $4.20 per case, as listed in

-24-

their catalogue. Out of this $4.20, Supreme received $2.82, which was supposed to represent Supreme's profit and costs of operation and administration, with PWC receiving the rest, $1.38.

125.   In December 2005, with the commencement of Supreme's SPV contract, water was incorporated into this contract following the same contractual requirements of delivered pricing which required Supreme to invoice the actual costs to DSCP.

126.   Under the SPV contract, the distribution fee for water was raised to $4.87 per case, which, as with other products, was to account for Supreme's profit and costs of operation and administration.  Because Supreme's costs did not increase, the increase from $2.82 to $4.87 resulted in an increase of pure profit.

127.   Supreme incorporated the same price of $6.45 which they had used under the PWC contract into their own catalogue pricing, representing to DSCP that that was a mixed price accounting for the average actual product costs from various vendors, including the costs of transporting water to the OCONUS warehouse, in this case the Kabul water warehouse.

128.   The actual purchase and cost of transporting the water to the OCONUS warehouse were much lower.

### 2.   Water products imported from United Arab Emirates

129.   Most of the water purchase contracts Supreme entered into were for water from various suppliers in the UAE. The mix of suppliers changed over time but were principally National Mineral Water Company (Tanuf brand), Emirates Pure Spring Water Company (Pure Spring brand), and Oasis Pure water (Oasis brand).

130.   As a subcontractor to PWC, Supreme had handled all the transportation of water from the various suppliers to Supreme's main warehouse in Kabul. Under Supreme's own contract, the transportation was to be provided by the government through its transportation system, Surface Deployment and Distribution Command ("SDDC").

131.   In December 2005, at the beginning of the PV contract, through at least August 2006, Supreme continued to handle as much transportation of water as it could. The Government repeatedly requested that Supreme use SDDC to transport the water; however Supreme used delays in shipments by SDDC as a reason it needed to continue to use its own transportation network.  Regardless of whether Supreme or SDDC transported the water, Supreme charged a delivered cost of $6.45 per bottle. When SDDC transported the water, however, Supreme was contractually obligated to only charge the supplier's actual invoice price, with no transportation cost.

132.   As the United States Government's pressure to comply with contractual transportation rules (use of SDDC) increased, on February 1, 2006, Armin Schroeder instructed JAFCO to order 50% of the water with SDDC shipments and 50% with Supreme shipments. Mr. Epp reiterated these instructions in March 2006, though the actual transportation split varied considerably for the first few months of the PV contract.

133.   The water continued to be invoiced to the government at $6.45 per case whether it was transported by Supreme or SDDC.

134.   Beginning in mid-March 2006, SDDC pushed for control of all water

transportation through their system. Even though Supreme's profit margin was smaller when they provided the transportation themselves, Supreme was not willing to surrender all transportation to SDDC because Supreme feared that DSCP would then require a lower per case rate or a lower per case Distribution Fee. There was internal discussion and conflicting instructions over the next few months regarding how much and when water delivery should be transitioned to SDDC.

135.   On June 5, 2006, Armin Schroeder questioned why there had been only a few shipments with SDDC. "If this is correct we are loosing (sic) a lot of money (For each case app. 2.30 USD?)." Mr. Schroeder clearly understood that Supreme had no intention of lowering the delivered price, per its contractual requirements, when SDDC shipped the water.

136.   Nevertheless, under pressure from DSCP, Relator instructed on July 22, 2006 that 100% of DoD water was to be switched to SDDC. This request was complied with, as evidenced by Supreme's Daily Status Reports. Supreme's transportation of water dropped from a rate of approximately 56% in April 2006, to 14% by August and to 0% beginning in October 2006. The rate charged to DSCP continued to be $6.45 per case.

137.   On November 13, 2006, Zehier Hijazi, Supreme's Financial Controller, emailed Mr. Epp about water sales:

> "It has come to my attention that the transport costs of the water sold to DoD is now being paid by the US Govt. Will this reduction of transport costs to Jafco be reflected in the reduction of the sale price of water to DoD. Please advise if a new sale price of US water will be charged....if there is a change to the sale price a Credit note can

be calculated and produced from Jafco to DoD...."

Mr. Epp answered that there was a new mix of water supply so "there is no change in water pricing for 24x0.5 Liter."

138.   From December 2005 to December 2006, Supreme sold approximately 4.5 million cases of 0.5 liter bottled water under the SPV contract. This resulted in invoice pricing to DSCP of $29,025,000 at a catalogue price of $6.45 per case.

139.   Approximately 1,144,000 (25%) of these cases were transported by Supreme for an approximate delivered cost of $4.22 ($1.83 product cost + $2.35 transportation cost). Supreme should have invoiced the government $4,827,680. But Supreme invoiced the government $6.45 per case for a total purchase price of $7,378,800.

140.   Approximately 2,556,000 (57%) of these cases were transported by the government thru SDDC (the remaining were transported by Venus water as discussed in paragraphs 143-144 below). The invoice price to the government should have been $1.83 per case (a mixed-price for product cost only) for a total of $4,677,480. Supreme invoiced $6.45 per case for a total of $16,486,200.

141.   Supreme made an illegal profit of $14,359,840 for one year of water sales of UAE water.

142.   Supreme recognized an additional $22,131,189 in Distribution Fees for these deliveries.

### 3.   Water products imported from Pakistan

143.   Supreme also imported water from Venus Distributors (Nestle Pure Life)

in Pakistan. Venus always provided the transportation and invoiced Supreme one price for the product and the transportation. Venus's charge to Supreme was $5.03 per 24-bottle case of .5 liter bottles.

144.   Supreme invoiced the government the same catalogue price of $6.45 per case, representing an illegal profit to Supreme of $1.42 per case. Relator is aware of at least 120,000 cases of water from Venus that were invoiced to Supreme, and believes the number of cases might have been as high as 800,000.

### 4.   Water products from local suppliers in Afghanistan

145.   In the summer of 2006, the United States began a program designed to increase purchases from local suppliers in Afghanistan.

146.   Supreme resisted this effort in the case of bottled water because the locally-supplied water cost more than the imported water and Supreme feared this would cut into their profits.

147.   After months of negotiation, Supreme signed a contract with Afghanistan Beverage Industries ("ABI") to purchase both .5L bottle and 1.5L bottle cases at a higher price than imported water but still less than the price Supreme was charging.

148.   There was internal discussion within Supreme of presenting an increased water rate to DSCP, but Supreme opted to not "open a can of worms" and accepted the slight deterioration of water gross profits.

149.   There was also internal discussion about lowering the price of water to ensure that DSCP would not require Supreme to purchase water from the A-Z company, a potential local supplier that was well-connected with the United States

Army.  Supreme knew that the A-Z water would be even more expensive than water from ABI.  But this was not agreed to either.

150.   Part of the loss of profits was made up by the change in the case size of the water.  ABI could only package the 0.5 liter bottles of water in 12-bottle cases instead of 24 and the 1.5 liter bottles of water in 6-bottle cases instead of 12.

151.   Orenstein instructed Relator to lower the case size but to keep the Distribution Fee the same for the smaller case size.  Relator refused to do that for the 0.5 liter size, but did agree for the 1.5 liter size.

152.   For the 0.5 liter size, Supreme simply put two 12-bottle cases together to make a 24-bottle "case," and charged the government the agreed-upon distribution fee. They could have done the same with the 1.5 liter bottles.

153.   But rather, Relator, upon Orenstein's instructions, presented to DSCP the actual invoice cost of the 1.5 liter water (with a local transportation cost) and kept the distribution fee the same for the 6-bottle case as it had been for the 12-bottle case. Relator represented this as lowering the price to DSCP.

154.   But in fact it resulted in a higher price to DSCP.  The original price for the 12-bottle case was $8.47 + $4.87 Distribution fee, for a total of $13.33 per 12-bottle case.  The new price was $2.63 for a 6-bottle case plus the same DF of $4.87 for a price of $7.50 for a 6-bottle case or $15.00 for 12 bottles.

155.   Relator estimates that Supreme thereby earned from the United States extra distribution fees of approximately $1,000,000.00 per year.

156.   Orenstein's doubling of the distribution fee for water by halving the case

size was not commercially reasonable, was unfair to the United States, and constituted fraud.

157.   All claims submitted by Supreme for water delivered to Afghanistan after the Prime Vendor contract took effect were false claims.

158.   The two major UAE water companies, Venus Water from Pakistan, and ABI Water from Afghanistan all gave Supreme prompt payment discounts of 5 to 6%. As with the other prompt payment discounts Supreme received, these were not passed on to the government but illegally kept by Supreme. The discounted prices have not been figured in the pricing noted above.

### E.   SUPREME ILLEGALLY PROFITED ON AIRLIFT AND ROAD TRANSPORT CHARGES BY MISREPRESENTING TO THE UNITED STATES THE COST OF SUBCONTRACTING FOR TRANSPORTATION.

#### 1.   Inbound transportation

159.   After the Prime Vendor contract was awarded, there was debate between Supreme and DSCP regarding whether the Distribution Fees that Supreme had proposed and DSCP had accepted were expected to cover the cost of airlifting local market ready ("LMR") products, including fresh fruit and vegetables and other perishable food products, from a consolidation center to the designated Afghani sites in the solicitation - Kabul, Kandahar, Bagram and Salerno.

160.   Supreme represented that their proposal had assumed that air transportation costs were not included, since the cost of airlift was higher than the negotiated distribution fees for LMR products.  Alvarez told DSCP that Supreme "did not

understand the distribution fee as including the price of airlift from an outside source into our distribution facility."

161.   DSCP, according to Alvarez, responded that Supreme's price was high enough for DSCP to conclude that airlift expenses were included, but that if there was a mistake in bid, DSCP might have to re-evaluate the bids.

162.   Ultimately, DSCP asked Supreme to make a separate bid for the inbound airlift charges.  Relator was charged with putting together the bid.  On August 2, 2005, defendant Orenstein e-mailed Mr. Epp, stating "I request you to not discuss price issues in the broader round [*i.e.*, with others inside the company].  Only you, Joe [Alvarez] and me is enough, others have no need to learn about airlifts margins and related improvements."

163.   Supreme saw the airlift as a way to increase their profits beyond the agreed-upon distribution fees.  They investigated several avenues to make this a reality, all the while conferring with PWC regarding the various proposals they were considering because Supreme and DSCP were discussing an early start-up of the provision of LMR product under PWC's contract.

164.   In June 2005, Relator and Alvarez met with National Air Cargo ("NAC"), the incumbent Department of Defense airlift contractor, to determine what NAC was charging the government.  Supreme determined that NAC was charging $2.25 per pound of gross weight.

165.   NAC offered to provide airlift services to Supreme at a lower price than it was charging the United States.  In fact, however, Supreme was already airlifting into

-32-

Afghanistan under its ISAF contracts, so it knew full-well what it cost to do so. Supreme's team met with NAC only to determine what NAC was able to charge the Defense Department.

166.   On October 3, 2005, PWC senior manager Toby Switzer wrote to Alvarez, saying "[f]rom some of my private discussions with DSCP, I think we may be in jeopardy on the FF&V and especially the airlift business both now as well as your contract. Apparently they are really bouncing back between your proposal and probably letting NAC do it, which if NAC did it, it would really reduce the size of your contract."

167.   Supreme personnel also traveled to Bahrain to investigate how the incumbent provider (BMMI, Bahrain) was packing FF&V for airlift into Afghanistan. BMMI was using triwall containers packed with wet ice to keep perishable food fresh. The wet ice resulted in high shipping costs.

168.   Supreme investigated the use of dry ice. Dry ice has significantly higher cooling capacity than wet ice.

169.   After determining that dry ice would maintain packed food at the needed temperature for the necessary 48-hour period, Supreme offered DSCP two shipment options, both premised on the use of wet ice. First, $2.20 per pound *gross* weight—including ice—which was marginally lower than NAC's $2.25 rate. The second price quote was for $3.74 per pound *net product* weight—*i.e.*, not including ice and packaging.

170.   The gross weight proposal and the net weight proposal were both highly inflated representations to DSCP. An email sent from Sujeen to Relator on August 23,