2005, estimated that Supreme's direct cost to Kabul, for example, with the typical IL76 aircraft that Supreme used, was $.61 per pound gross weight with 100% utilization and $.81 per pound gross with 75% utilization.

171.   Supreme represented to DSCP that the rationale for the net pricing proposal was that Supreme had conducted tests which demonstrated that the ratio of gross weight to net product weight, with the necessary amount of wet ice, was between 1.8:1 and 2:1.  A cost of $3.74 represented a ratio of gross weight to product weight of 1.7:1, creating the appearance that Supreme was offering the Defense Department a discount.

172.   The United States relied on Supreme's representations and selected the second option.

173.   In fact, Supreme had never done any testing with wet ice and fabricated the 1.8:1-to-2:1 ratio while intending all the while to use dry ice if DSCP chose the *net-weight* option, knowing that the actual ratio using dry ice was between 1.12:1 and 1.2:1, without packaging material.

174.   Supreme used the gross-weight pricing proposal as a means of directing the attention of contract decision-makers toward the fraudulent 1.7:1-based pricing, and intended, if the *gross-weight* proposal was accepted, to use wet ice because it could charge more for the same volume of product.

175.   Supreme never informed DSCP that Supreme's costs associated with the use of dry ice were much lower than what was represented to the United States, and consistently billed the government at the $3.74-per-pound price.

176.    The effect of this fraud is dramatic.  A hypothetical airlift load of 50,000 pounds net product on a single IL-76 transport aircraft, at a shipping cost of $3.74 per pound, would generate shipping revenue of $187,000.  Mr. Epp estimates the actual shipping cost of that hypothetical load at $40,000 to $43,000, meaning that Supreme was realizing profit of approximately $140,000 per plane load of supplies.

177.    Though DSCP agreed to the $3.74 per lb net weight as being "fair and reasonable," they objected to the minimum weight requirements that were in Supreme's proposal, as well as Supreme's efforts to tie the agreed-upon rate to changing fuel costs.  Relator, in an email to Mr. Alvarez in October 2005, suggested not stressing the minimum too much "if we get the 3.74 through."  But Mr. Alvarez was not ready to concede even that possibility, saying, "No - we need to be careful in setting a precedent."

178.    Supreme saw inbound airlift as their highest revenue/profit maker.

179.    On December 19, 2005, Relator sent Orenstein and Alvarez an email regarding Supreme's progress to date, beginning with the provision of LMR product under PWC's contract.  He noted that Supreme, after only five weeks of operation, had already earned a gross margin of $1.1 million on airlift sales at a "modest 3.74 USD."  Relator went on to say, "If I look back, the best thing was our idea to switch to 'net' and convince the customer to buy it as an innovation."

180.    In 2006, Supreme contracted to fly 1,142 flights into Afghanistan.  The United States was billed and paid more than $85 million for transportation in connection with those flights.  Supreme's total expense in connection therewith was $24.5 million.

-35-

The resulting $60.5 million profit was not fair or reasonable and was the result of con-scious misrepresentations to DSCP by Supreme.

### 2. Outbound transportation, from Kabul to the Forward Operating Bases

181.   Shortly after the contract was awarded to Supreme, the Army determined that delivery was going to be required to many more locations than the four sites listed in the solicitation.

182.   There was again discussion between Supreme and DSCP regarding who would provide this transportation.  Supreme was very desirous of supplying all of the transportation through their own supply chain, since this would represent another opportunity for additional profits for them.

183.   DSCP asked Supreme to send a proposal regarding their costs for transportation from the contract designated sites to the Forward Operating Bases ("FOBs"), by air and by road.  DSCP instructed Supreme to include all costs that they would like included in the proposal and to present it in detail.

184.   In late 2005, Orenstein directed Relator to generate a transportation pricing proposal for these additional delivery sites for presentation to DSCP by Alvarez.

185.   Relator devised cost models which took into account estimated delivery quantities and cost proposals from subcontractors for transportation by land, fixed-wing aircraft, and rotary-wing aircraft.

186.   Relator was not provided any guidance regarding the requirements of the contract or of U.S. procurement law with respect to transportation expenses, nor was he tasked with determining such requirements.  In developing his pricing model, his focus

was on maximizing Supreme's profits.

187.   On November 3, 2005, DSCP e-mailed Joseph Alvarez regarding pricing for outbound transportation.  DSCP's Maryann DiMeo wrote that Supreme was expected to provide "all costs visible in this breakout – give me a sample of what you would actually want to see billed so that I have a picture of total costs, nothing omitted . . . all transportation included and broken out."

188.   In an e-mail to Alvarez on November 12, 2005, Relator outlined the costs and pricing proposals for the three methods of transportation.

189.   Supreme's actual cost of truck transport to the FOBs, including an arbitrary 25% surcharge for risk, was $0.14 per pound.   When Relator identified the $0.14 cost per pound (in an earlier conversation) and  proposed to Orenstein that Supreme propose a rate of $0.23 to $0.25,  Orenstein rejected this suggestion and said, laughing, "Michael, what do you think PWC would have offered here?" and advised $0.49.

190.   Thus, Relator abided by this suggestion and proposed a road transport rate of $0.49 per pound.  The rate which Supreme proposed for land delivery, therefore, was 350% of an already-burdened cost of $0.14 per pound.

191.   The inflated $0.14-per-pound price was premised on Supreme making deliveries using its own trucks.  In fact, all transports to FOBs were done by subcontractors at even lower, fixed rates.

192.   Relator suggested proposing to DSCP a price for transport by fixed-wing aircraft at $2.60 per pound net weight.  Relator determined that actual cost, based on charter rate, flight time, and gross load, was $0.75 per pound gross weight.

193.   The proposal of $2.60 per pound net weight reflected a 90% markup, based on the same ratio of gross weight to net weight of 1.7:1 that had been put forth for inbound flights.

194.   Since the ratio of gross weight to net was actually closer to 1.3:1, as discussed in paragraph 173, the markup was much more than the 90% to be portrayed. Relator estimated that this proposal would generate a $64,000 profit to Supreme per week for each airplane used to airlift product.

195.   The suggested proposal for transportation by helicopter was $8.27 per pound of product.  Relator calculated that Supreme's actual cost, based on charter rate, flight time, and gross load, was $2.60 per pound gross weight.  This proposal was presented as reflecting a 76% markup, also, as in the case of fixed-wing airlifts, calculated on a ratio of 1.7:1 gross weight to net weight.  The actual ratio was 1.3:1.  Relator estimated this proposal, if implemented using three helicopters, would result in a profit to Supreme of $356,000 per week.

196.   Following the pervasive directive of Supreme's management to drive profits higher, on November 16, 2005, Relator e-mailed Orenstein and Alvarez, summarizing the previous proposals and suggesting even higher rates:

> at the end of the day it is important what we think we can get through.  If we assume more would be accepted I recommend to go with a 5% higher rate for both, fixed wing and helo: Fixed wing: 2,73 USD  v. 2,60 USD per net lb,  Helo: 8,68 USD vs 8,27 USD per net lb. This would generate [$21,000] more gross margin per week.

197.   At this point in time, Orenstein and Alvarez were working with PWC Logistics, which is owned by Zone 1 contractor PWC, to arrange for transportation to the

FOBs, with Supreme functioning as a subcontractor to PWC.

198.   Alvarez or Orenstein forwarded Mr. Epp's pricing to PWC Logistics.  By e-mail dated November 23, 2005, Toby Switzer, General Manager of PWC Prime Vendor forwarded those prices to DSCP Contracting Officer Maryann DiMeo and others at DSCP with a representation that "***PWC worked closely with Supreme to provide justification for fair & reasonable pricing of the cost augmentations proposed below. These are straight pass through costs incurred by our subcontractor Supreme and PWC has NOT factored in any additional costs.***"  Emphasis in original.

199.   In fact, Switzer's representations, which were simply forwarded to him by Alvarez,  were false and were known to be so by Supreme.  The prices quoted by PWC were those developed by Relator, which were known by Alvarez and Orenstein *not* to be "straight pass through costs," and were certainly not intended by Supreme to be "fair and reasonable."

200.   Relator was not directed to create pricing models which were "straight pass-through costs."  Rather, his charge was to develop and propose pricing in line with Supreme's business model to maximize profits arising from military contracts.

201.   DSCP rejected PWC's proposal by e-mail from Contracting Officer Maryann DiMeo on November 29, 2005, because the rates were too high.  Ms. DiMeo noted that historically DSCP was accustomed to paying one fixed price for airlift in Afghanistan, regardless of the type–fixed wing or helicopter.  She went on to say that the government would accept different rates, "however, we would expect at least one of

these prices to be lower than our historical rates, rather than both higher....Historically, we paid much lower prices than this for FOB delivery irregardless of the type of craft utilized."

202.    In early December 2005, Supreme and DSCP agreed to negotiate the airlift rates themselves, rather than through PWC. On December 25, 2005, Alvarez sent Ms. DiMeo a breakdown of Supreme's fabricated costs, representing that fixed wing aircraft cost $2.43 per net pound and reiterating their proposal of $2.73 per pound to include Supreme's profit.  He represented Supreme's costs for helicopter at $7.68 per net pound, reiterating their proposal for $8.68 to include Supreme's profit.  He also reiterated the transportation by truck at $.49 per pound but did not include a breakdown of costs.

203.    Further negotiations ensued between Supreme and DSCP, with DSCP continuing to question Supreme's proposed rates.  Relator also continued to struggle to put together a response to DSCP that would appear to justify the requested rates, as noted in an email he sent to Alvarez and Orenstein on February 20, 2006, in which he stated, "I have some more work on the pricing justification....." and in an email sent to Alvarez and Orenstein on February 25, 2006, "With regards of the trucking cost, it appears difficult to justify the price of 0.49 USD per lb with cost.  I tried my best to allocate as high as possible, but frankly, don't feel comfortable, probably you have some better ideas."

204.    After input from Orenstein, with both he and Relator juggling figures to make it appear that Supreme would be making a lower profit rate, Relator finally

provided additional information to DSCP on March 15, 2006, proposing the same rates as originally requested but providing further breakdown of costs.  He also provided for the first time a breakdown of costs for truck transportation, representing that the cost for trucks was $0.44 per net pound, with the proposal to DSCP still standing at $0.49 per pound, providing a small profit for Supreme.

205.   During these negotiations, in January 2006, Ms DiMeo had emailed Alvarez, telling him that in regard to the proposal to the FOBs, you "need at least to have a certified claim type format from Supreme–i.e certifying that all of these charges are accurate, submitted in good faith and address all deliveries."

206.   On April 12, 2006, Ms. DiMeo sent Orenstein and the other principals "certified claim language" from 48 CFR 33.207, noting that Supreme had requested this at the conference in Las Vegas.

207.   After various intervening communications, on May 3, 2006, DSCP contract management e-mailed Relator, with copies to Orenstein, Alvarez, and others, calling Supreme's positions into question and stating that "I have also never seen a certification from Supreme attesting that all of these submitted costs are accurate and submitted in good faith."

208.   Mr. Orenstein asked Relator to draft a response to DSCP's questions and forward to him and Mr. Alvarez before sending to DSCP.

209.   A week later, Mr. Epp complied with this request and sent Mr. Orenstein and Mr. Alvarez his proposed answers to DSCP and suggestion for the certification that DSCP was requesting.  Later that same day, Relator e-mailed DSCP claims for fixed-

wing air support for the period November 2005–April 2006 based on the fixed-wing

support figure of $2.73 per pound (totaling $4,177,830.93) and $8.68 for rotary-wing

transport (totaling $5,786,530.68).  At the insistence of Defendants, Relator's e-mail

included an express certification that "this claim is made in good faith; that the

supporting data are accurate and complete to the best of my knowledge and belief; . . .

and that I am duly authorized to certify this claim on behalf of Supreme."

210.    Supreme included this certification on its invoice requests to DSCP several

times thereafter.

211.    Relator was reluctant to provide this language to DSCP.  He raised his

concerns with Orenstein and Alvarez and was told that the certification was a formality

with no consequence.

212.    Orenstein and Alvarez knew that the information Relator certified as true

on behalf of Supreme was false and intended that the certification induce DSCP to rely

on those false statements to its detriment.

213.    Supreme's proposal to DSCP contained the risk/profit markups that

Supreme had juggled internally to lower over the last few weeks–13% "risk/profit mark

up" for fixed-wing air transport; 16% "risk/profit mark up" for helicopter transport; and

11% "risk/profit mark up" for ground transportation.  Each of these figures is dramatically

less than the huge actual profit margins detailed above.

214.    DSCP rejected Supreme's pricing proposals by e-mail from DSCP contract

management to Mr. Epp, with copies to Orenstein, Alvarez, and others, on or about May

11, 2006.

215.   Relator emailed Orenstein and Alvarez with his suggestion to lower the profit level, noting that Dimeo had "obviously bought into the cost." To offset the lower transportation profits, Relator suggested adhering to Supreme's original triwall rates. The trade-off would result in a net gain of $1,000,000.00 for Supreme.

216.   On or about May 15, 2006, Relator e-mailed DSCP contract management with a proposal reducing fixed-wing rates per pound from $2.73 to $2.65, a purported "risk/profit" reduction from 13% to 10%; helicopter rates from $8.68 to $8.45, a purported "risk/profit" reduction from 16% to 13%; and ground transport rates per pound from $0.49 to $0.48, a purported "risk/profit" reduction from 11% to 9%.

217.   DSCP ultimately agreed to accept the proposed "costs" with a smaller profit mark-up.

218.   Supreme never disclosed to DSCP that the costs which PWC had quoted to DSCP on its behalf were inflated.

219.   In August 2006, DSCP finally agreed to the following rates:

a.   Fixed wing at $2.65 per pound. This was represented by Supreme to be a 9.5% profit, but in fact constituted a markup of 235%.

b.   Rotary wing at $8.35 per pound. This was represented by Supreme to be an 11.9% profit, but in fact constituted a markup of 212%.

c.   Road transport at $0.48 per pound. This was represented by Supreme to be a 9.1% profit, but in fact constituted a markup of 243%.

220.   Throughout this period, the United States had not paid Supreme's transportation invoices. Because of the resulting substantial backlog, DSCP agreed to pay 75% of the outstanding claims in two $12,500,000 installments for the year-to-date

-43-

services and to pay 75% of each new submitted invoice.

221.   Supreme sought equitable adjustment of $33,502,365 for the amounts which DSCP withheld, resulting in an audit by the Defense Contract Audit Agency (DCAA).

### a.   DCAA's audit of Supreme's outbound transportation charges

222.   DCAA began its audit in August 2006.  On August 31, 2006, an auditor asked for all of Supreme's invoices and documents to support its price structure.  After two weeks and following two more requests, Relator finally responded that Supreme was unable to provide the records because the "costs are not allocated to a cost centre mirroring exactly the activities."  Relator suggested that the auditor review the documents that had been provided to DSCP during the initial negotiations regarding transportation rates.  Actually Supreme was able to present cost data for airlifts, which was monitored by Relator on a daily basis.  By third quarter, 2006, Supreme was also beginning to monitor costs for road transportation.

223.   On October 20, 2006, the auditor recommended that the claims for payment be returned to Supreme because Supreme had only provided estimated rates unsupported by any cost documents.

224.   On December 4, 2006, Alvarez asked for a face-to-face meeting with the auditor "to get a better understanding of what information needs to be shared." Meanwhile, knowing that Supreme would not be able to support the submitted invoices, whether in full or even at the reduced 75% rate, Orenstein created a team, led by Relator, to "allocate" various "indirect costs" to justify Supreme's claims.  By way of

example, Supreme inflated warehouse costs and created "self-insurance premiums."

225.    In January 2007, Supreme's Supply Chain Analyst, Naveed Ahmed, completed an analysis of Supreme's outbound road transport, excluding triwall. Ahmed's analysis showed that Supreme's profit margin on road transport alone was almost $22 million on invoice charges to DSCP of $25.7 million, a gap of more than $21 million.

226.    Naveed's analysis also showed that significantly more truck trips had been charged to DSCP than Supreme had invoices for.  Relator believed that this discrepancy was caused by Supreme's incorrect labeling of FOB and solicitation locations.

227.    On January 25, 2007, Relator relayed this information to Alvarez and Orenstein, noting that Supreme had likely classified some of the road trips incorrectly. He noted that this would result in the "gap" between profit and revenue as being $14 million, as opposed to $21 million if the figures had been correct.  The $14 million gap "requires the justification of a significant amount of other cost apart from a reasonable profit."  Relator surmised that the cost could be represented as "Transport damages (rejections, spoilage etc); Vehicle damage (we need to show that we paid for it, which we didn't); Administration cost; Incremental cost of picking and marshaling small orders (vs solicitation).  I am pretty concerned that we might have problems to really justify the gap and therefore would like to start to work with operations immediately in order to put that additional cost together."

228.    On February 1, 2007, Relator e-mailed Joseph Alvarez and Orenstein that

-45-

he expected the total gap between revenue and expenses in all outbound transportation YTD December 2006 to be approximately $40 million. "As this gap is quiet (sic) likely more than we might be able to justify with other cost like overhead, picking of small orders and risk surcharge we need to develop a strategy how to deal with this before we enter into the audit process or announce any faulty billing to DSCP." This was five months after the DCAA auditor asked for Supreme's supporting accounting records.

229.   On February 4, 2007, Relator e-mailed Alvarez and Orenstein to confirm the discrepancy in the number of deliveries to FOBs and that this resulted in a value to the Government of $9 million. Relator reiterated to Alvarez and Orenstein that "[t]his will reduce the gap to be justified in the upcoming audit from approx. $40m (inclusive air support) to $31m if we reimburse."

230.   Orenstein e-mailed back within hours, saying "I would like to have a conference call at 10 am CET tomorrow with the three of us before anyone communicated anything else (even internally) on this matter."

231.   In the course of a telephone call the next morning, Orenstein instructed Relator to put nothing else in writing and to keep quiet about the problems identified in his e-mails.

232.   On information and belief, Orenstein had no intention to reimburse DSCP.

233.   From November 2005 to December 2006, Supreme, in order to support the locations not included in the contract, undertook 715 fixed wing missions with AN12/26/74 aircrafts generating a revenue (at 100%) of $13.041 million, with gross profit of $9.039 million; and 801 rotary wing missions generating $14.341 million

-46-

revenue (at 100%) with $9.329 million gross profit–a profit rate of 65%.

234.   From December 2005 to October 2006, Supreme contracted for 3629 road

trips invoicing $25.72 million (at 100%) to the government and generating a gross profit

of $21.906 million.  Overall the entire outbound operation by air and road generated

gross profits of $40.724 million.  On top of this, Supreme earned the regular contractual

Distribution Fee for each and every case transported in those missions.

235.   All claims submitted based on inflated shipping charges were false.

### 3.   Return flights from Kabul to Sharjah

236.   Some of the FOBs that Supreme agreed to deliver to were on the flight

path of returning aircraft from Kabul.  Supreme routinely used the returning aircraft to

deliver product to these FOBs.  Since the government was already paying for a round

trip flight from Sharjah to Kabul and back, at $3.74 per net pound, these deliveries

incurred no extra cost beyond the small amount of fuel used in landing and taking off

and the airport fees.

237.   But Supreme invoiced the government as if the delivery had been made in

the usual manner–in separate, smaller aircraft from Kabul, at an additional $2.65 per net

pound.  This was cost that Supreme had not incurred.

### 4. Other airlift opportunities

238.   Supreme also billed the United States for shipping at the rate of $3.74 per

pound for airlifts of dry cargo—for example, canned goods and combat rations—where

the difference between gross and net weights was no more than the wooden pallet on

which the product was stacked for shipment.  These charges were, as always, in

-47-

addition to Supreme's hidden discounts and distribution fees.

239.   In one particularly-egregious example, Supreme, at Orenstein's direction, airlifted UHT milk into Afghanistan for months after the Prime Vendor contract began, until DSCP finally complained that it was too expensive to airlift—$45 per case in transportation charges alone.  UHT milk is sold in sterile boxes, has a shelf life of six to nine months, is stored at room temperature, and is routinely shipped by sea.

240.   Both on their face and because DSCP was fraudulently induced into its agreement to pay Supreme's charges, Supreme's profits on shipping were unfair and unreasonable, and its claims for payment for such profits violated the False Claim Act.

F.   **SUPREME ILLEGALLY PROFITED ON TRIWALL CHARGES BY MISREPRESENTING THE COST TO THE UNITED STATES**

241.   The solicitation assumed that LMR product would be transported in triwalls.  After award of the contract, Supreme and DSCP debated whether the cost of triwalls was intended to be included in the Distribution Fee.

242.   Supreme's reasoning was that the cost of triwalls had been included in their original proposal submitted to DSCP.  But DSCP argued that this provision had not been included in either the solicitation or contract and was not expected to be a separate cost.

243.   Supreme's original proposal to the government's solicitation included the following for triwall preparation:  $193.00 for each dry triwall container; $316.50 for each chilled container; and $361.00 for each frozen triwall container.

244.   Apparently this proposal was submitted without actual evidence of cost, as it was left up to Mr. Liensavanh after the award of the contract to come up with

Supreme's cost.

245.   On August 25, 2005, Liensavanh sent an email to Relator with his figures
on Supreme's cost to prepare triwalls, including the material costs of dry ice, pallets,
shrink wrap, foam underlay, cartons, and labels and the labor costs, which included a
packing team, supervisors, and forklift operator.  Liensavanh's estimate was $51.54 per
triwall.

246.   In October 2005, DSCP, along with their acceptance of Supreme's inbound
freight rates, agreed to pay the same rate for triwalls that had been negotiated with
PWC for their Iraq contract–$129 for dry triwalls, $211 for chilled and $153 plus the cost
of dry ice for frozen.

247.   Even though this would have provided a substantial profit for Supreme,
this pricing was not satisfactory to them.  They continued to claim that the pricing which
they had included in the original proposal should be accepted.  In November 2005,
DSCP agreed to consider Supreme's proposal to "see if what you propose can be
determined reasonable in the context of the proposal as a whole."

248.   On November 21, Relator sent Orenstein an invoice showing how frozen
triwalls would be priced from JAFCO, under the pricing that PWC used and that DSCP
agreed to.  Mr. Epp related to Alvarez that "Stephen, as usual, was not happy at all. [H]e
thinks we should have charged chilled tri wall price vs frozen plus the dry ice...the total
is lower than the 211 USD.  He blamed us for having accepted this from PWC who
advised us to charge that way."

249.   Relator recounted in an email sent to Orenstein and Alvarez on December

-49-

19, 2005, referenced in ¶ 179 above, that Supreme had already made, as a

subcontractor to PWC before the beginning of Supreme's PV contract, $70,000 gross

margin on charges for 742 triwalls— more than $94.00 per triwall, charging the rates

under PWC's contract.

250.    On January 22, 2006, Alvarez invoiced DSCP for the first two weeks of

Supreme's airlift billing with Supreme's pricing, including the higher prices for triwalls.

Mr. Ferzetti of DSCP questioned Supreme's triwall pricing and noted that PWC's prices

had been agreed to.  "Anything other than this would have to be determined fair and

reasonable before being approved."

251.    Alvarez responded that Supreme used the triwall rates that were contained

in the contract (though there were actually no rates contained in the contract, only in

Supreme's initial proposal.)  Ms. DiMeo of DSCP again reminded Supreme that the

government had not solicited separate triwall rates, but since Supreme had factored

these as a separate cost, they were letting them bill for it and were "willing to pay you

the rates that Tom provided below [PWC's rates], which have been determined fair.  If

you have other information to submit to justify your $316.50 price we will review it . . . if

we are able to justify it."

252.    Internal discussions continued within Supreme regarding the triwall rates

along with outbound transportation rates.  In an email on April 24, 2006, Relator tells

Alvarez and Orenstein that if DSCP accepts Supreme's rate proposals for outbound

transportation, that he would accept the lower PWC rates for triwalls "to give them the

feeling of 'success' in negotiation."

253.    But then in May, when DSCP continued to push back on the transportation rates, Epp emailed Alvarez and Orenstein again, recommending that they accept a lower profit margin for their transportation rates and continue to propose the original triwall rates.  He noted that the higher triwall rates would have a "positive impact" of $1.4 million dollars for Supreme, which would offset the loss in transportation and would result in a net positive impact of $1,000,000.

254.    In an email on May 16, 2006, Relator presented another proposal to DSCP with the slightly reduced profit margin for transportation and the original triwall charges. In their reply, DSCP again asks Supreme to reconsider the triwall costs because "it is significantly higher than tri-wall costs from other sources. If you can significantly lower this price it will get us past a major hurdle."

255.    Relator sent an email with updated claims on June 1, 2006, along with a letter proposing a lower rate for triwall pricing.  Relator wrote that "Supreme accepts DSCP's argument that each service provided should be itself independently determined as fair and reasonable" and proposed a rate of $241 per chilled triwall and $302 per frozen, still higher than PWC's rate and significantly higher than Supreme's actual costs. The email certified that "this claim is made in good faith . . ."

256.    The triwall claims, along with the transportation claims, were debated back and forth for several months between Supreme and DSCP and ultimately submitted to audit.

257.    In December 2006, Relator objected to the triwall charges being part of the audit since Supreme had "already met [their] requirement to drastically reduce the rates"

in May.  Ms DiMeo replied, "Concur.  This is quite a reasonable request.  I have for-

warded the file for Danni to fund, and instructed Joe and Don accordingly."

258.   DSCP reimbursed Supreme the 25% that had been held back pending the

outcome of the audit and from November 2006 on, paid Supreme the pricing submitted

by Supreme in May 2006.

259.   If DSCP had known Supreme's actual costs for the triwalls and that they

were claiming approximately $130.00 more per triwall than cost, they would not have

been able to consider the rate fair and reasonable in any way.

### G.   SUPREME KNOWINGLY CHARGED THE UNITED STATES MORE THAN IT PAID FOR FOOD WHEN A SUPPLIER'S CHARGE WAS INCREASED FOR NEW SALES OF ITEMS WHICH SUPREME HAD IN STOCK

260.   When Supreme received notice from a supplier that the cost of an item

was increasing, it immediately changed the price charged the government for that item,

no matter how much of the item Supreme had in stock and had acquired at the prior,

lower price.

261.   Under this circumstance, which occurred frequently, Supreme would

charge the new, higher price for all product delivered to the United States, including that

which had been procured at the lower price.

262.   This practice was specifically directed by defendant Orenstein.

263.   By knowingly charging the United States the higher price, Supreme

violated its Prime Vendor contract and the False Claims Act.

### H.   DEFENDANTS SUPREME'S, SUPREME GROUP, B.V.'S, SUPREME FOODSERVICE GMBH & CO.KG'S AND ORENSTEIN'S RETALIATORY CONDUCT AGAINST RELATOR

264.   As alleged above Mr. Epp alerted Defendants to the illegal practices identified in this complaint.

265.   Defendants acknowledged the practices, but refused to stop them. Instead, Mr. Epp was terminated on March 3, 2007, less than a month after he advised defendant Orenstein that Supreme owed the United States at least $9 million.  Plaintiff was told by defendant Orenstein that he, Orenstein, could not "protect" Mr. Epp from factions inside Supreme, and that Mr. Epp had acted, in some unspecified way, in a manner inconsistent with Supreme's "ethics." No further explanation was provided Mr. Epp to substantiate the accusations.

266.   The accusations made by Orenstein were contrived. The true reasons for Mr. Epp's termination included (1) his refusal to perpetuate Supreme's schemes to overcharge the United States under the PV contract, and (2) the fact that Mr. Epp's first-hand knowledge represented a clear threat to Supreme's ability to continue defrauding the United States.

267.   On March 28, 2007, Mr. Epp received a letter from Supreme indicating that he would receive three months' pay, until June 30, 2007. This was a violation of his contract, which mandated a minimum of six months' pay. The following day, Supreme sent a correction letter, acknowledging Mr. Epp's right to receive his salary through September 2007.

268.   After his termination, Mr. Epp began to investigate the possibility of filing a

*qui tam* action under the False Claims Act. As part of his investigation, Mr. Epp submitted an online questionnaire to a Texas law firm. Thereafter, emails were exchanged between Mr. Epp and an attorney in that firm discussing Supreme's fraud against the United States and the process for filing a False Claims Act case. On April 16, 2007, an email from the lawyer was directed by an e-mail forwarding rule to Mr. Epp's former email address at Supreme. The email, which referenced the "Subject: RE: Government Fraud /QuiTam Packet," was thus obtained by Supreme. Soren Borup Norgaard, Supreme's Director of Corporate and Legal Affairs, replied, stating that Supreme had received the message in error, and that it was being forwarded to the correct recipient.

269.   The next day, Supreme Director Michael Schuster delivered a letter to Mr. Epp's residence in Dubai stating that all salary payments were suspended and demanding the return of all company property.

270.   Several days after delivery of the letter, Mr. Epp was approached by Supreme principal Michael Gans. Gans inquired whether Mr. Epp remained open to settlement negotiations, and expressed concern that Supreme's willingness to carry on such negotiations could be perceived as an admission that it overcharged the United States on the PV Contract.

271.   Mr. Epp filed a complaint with a German labor court challenging Supreme's termination of salary payments.

272.   Supreme asked the court to suspend the proceedings to allow the parties an opportunity to pursue settlement negotiations. The ensuing months of negotiations

were unsuccessful, primarily because Supreme insisted on a global non-compete clause which would have effectively forced Mr. Epp into early retirement.

273.   During the pendency of the labor matter in Frankfurt, Germany, Mr. Epp traveled to his home in Dubai. Supreme filed an abscondence report with Dubai immigration  authorities claiming that he was there unlawfully, resulting in Mr. Epp's arrest and brief detention. Mr. Epp filed a complaint with the Dubai authorities contesting Supreme's report. A hearing occurred, and Supreme was ruled to have violated Dubai's immigration laws and fined 10,000 AED.

274.   Further negotiations between Mr. Epp and Supreme resulted in a Termination Agreement executed on September 26, 2007. The Agreement provided for the following payments by Supreme to Mr. Epp:

- Six months' salary (€37,964.52) for the period April through September 2007.

- A prorated bonus of €36,000.

- A "special bonus for excellent work" of €75,000.

275.   In addition, Supreme promised to pay Mr. Epp a further €400,000, subject only to the condition that none of Supreme's relationships with DSCP or any of its suppliers under the PV Contract "deteriorate significantly" due to "any influence, action, or activity" by Mr. Epp prior to the "cut-off date." The agreement provided that the €400,000 payment "must take place on" September 30, 2010, which coincided with the last day of performance under the PV Contract and is identified in the Termination Agreement as the "cut-off date.

276.   On September 26, 2007, the parties agreed to an amendment to the

Termination Agreement imposing a condition precedent to the tender of the €75,000

special bonus:

> [T]he parties agree that the payment of the special bonus of €75,000 does
> not take place at the conclusion of the termination agreement but only
> when the following requirements are met:
>
> the working papers of Mr. Epp who has identified Supreme as his
> employer, and the visas of Mr. Epp, his wife Yvonne and son Yannick must
> either be properly invalidated or transferred to another employer. The
> invalidation or transfer shall be made in compliance with the applicable
> laws of the United Arab Emirates and the Emirate of Dubai. Furthermore,
> Supreme shall have no further obligations regarding Mr. Epp, his wife
> Yvonne and his son Yannick to the United Arab Emirates and the Emirate
> of Dubai.

Mr. Epp agreed to "cooperate with the utmost commitment" to have the visas

invalidated within 14 days:

> The parties are mutually obliged to cooperate with the utmost commitment
> and to support each other to achieve the conditions referred to under
> section 1, so the invalidation or transfer of the documents to another
> employer can be achieved within 14 days. . . .
>
> Should Mr. Epp not fulfil his obligation to cooperate in accordance with
> section 2 above within 14 days, then the payments must pursuant to §2
> paragraph 1 a) and b) be returned to Supreme.

277.   Mr. Epp made reasonable efforts to surrender visas by UAE authorities.

However, due to intervening holidays and administration requirements, the process was

not completed until November 22, 2007.

278.   Despite Mr. Epp's efforts, Supreme refused to pay the agreed €75,000

after the visas were revoked, and further demanded Mr. Epp repay all amounts

previously paid under the Termination Agreement.

279.   Mr. Epp filed a complaint before a German labor court seeking payment of

the special bonus. The labor court ordered Supreme to pay Mr. Epp €75,000 plus

interest, which amount was paid on September 16, 2008, nearly a year after it was due

under the Termination Agreement.

280.   In or about early 2009, Supreme learned that the United States Depart-

ment of Defense was investigating its practices under the prime vendor contract.

281.   None of Supreme's relationships with DSCP or any of its suppliers under

the PV Contract deteriorated significantly due to any influence, action, or activity by Mr.

Epp.

282.   Supreme failed to make the required €400,000 payment on September 30,

2010, and that payment remains due and owing under the contract.

283.   Despite repeated inquiries by Plaintiff, Supreme has advanced no basis for

its failure to make the required €400,000 payment.

284.   Relator was discriminated against in retaliation for his objections to

improper conduct in violation of government laws and regulations which resulted in false

claims to the United States.

## COUNT I

### VIOLATIONS OF THE FALSE CLAIMS ACT BY DEFENDANTS SUPREME, SUPREME GROUP B.V., SUPREME FOODSERVICE GMBH & CO.KG, JAFCO AND ORENSTEIN

285.   The allegations of ¶¶ 1–284 are realleged as if fully set out herein.

286.   Defendant Supreme,  Supreme Foodservice GmbH & Co.KG, Supreme

Group B.V., and JAFCO, by and through its owners, officers, agents, and employees,

knowingly submitted or caused to be submitted false or fraudulent claims for payment or

approval of officers, employees, or agents, of the United States Government in violation
of 31 U.S.C. § 3729 (a)(1)(A).

287.   Defendant Supreme, Supreme Foodservice GmbH & Co.KG, Supreme
Group B.V. and JAFCO, by and through its owners, officers, agents, and employees,
knowingly submitted or caused to be submitted materially false or fraudulent claims for
payment or approval of officers, employees, or agents, of the United States Government
in violation of 31 U.S.C. § 3729 (a)(1)(B).

288.   Defendant Supreme, Supreme Foodservice GmbH & Co.KG, Supreme
Group B.V. and JAFCO , by and through its officers, agents, and employees, knowingly
conspired with others, including without limitation defendant Rastelli Foods and
nonparties PWC and PCA, to create false documents material to the payment of claims,
in violation of 31 U.S.C. § 3729(a)(1)(C).

289.   Defendant Orenstein caused defendant Supreme to submit false or
fraudulent claims to the United States, and conspired with, *inter alia*, defendant Rastelli
to cause submission of false claims to the United States, all in violation of 31 U.S.C.
§ 3729.

290.   Every claim for payment submitted by Supreme to the United States was a
knowingly false claim.

291.   The United States Government has been damaged as a result of the
Defendants' violation of the False Claims Act.

## COUNT II

### VIOLATIONS OF THE FALSE CLAIMS ACT BY
### DEFENDANT RASTELLI FOODS

292.    The allegations of ¶¶ 1–291 are realleged as if fully set out herein.

293.    Defendant Rastelli Foods, by and through its owners, officers, agents, and employees, knowingly caused to be submitted by defendant Supreme and nonparty PWC false or fraudulent claims for payment or approval of officers, employees, or agents, of the United States Government in violation of 31 U.S.C. § 3729 (a)(1)(A).

294.    Defendant Rastelli Foods, by and through its owners, officers, agents, and employees, knowingly  submitted or caused to be submitted false or fraudulent claims for payment or approval of officers, employees, or agents, of the United States Government in violation of 31 U.S.C. § 3729 (a)(1)(B).

295.    Defendant Rastelli Foods, by and through its officers, agents, and employees, knowingly conspired with others, including without limitation defendant Supreme and nonparty PWC, to create false documents material to the payment of claims, in violation of 31 U.S.C. § 3729(a)(1)(C).

296.    Every claim for payment caused by Rastelli Foods to be submitted to the United States which included undisclosed, unreasonable discounts and/or disguised profits to Rastelli Foods was a knowingly false claim.

297.    The United States Government has been damaged as a result of the Defendants' violation of the False Claims Act.

## COUNT III

## VIOLATIONS OF THE FALSE CLAIMS ACT'S ANTI-RETALIATION PROVISION, 31 U.S.C. 3730(h)

298.   The allegations of ¶¶ 1-297 are realleged as if fully set out herein.

299.   Defendants Supreme, Supreme Foodservice GmbH & Co.KG, Supreme Group B.V. and Orenstein violated the False Claims Act, 31U.S.C. § 3730(h), by: (1) terminating Mr. Epp's employment with Supreme due to his refusal to perpetuate Defendants' schemes to overcharge the United States pursuant to the PV Contract; and (2) thereafter breaching the Termination Agreement between Mr. Epp and Supreme upon learning that Mr. Epp had contacted counsel about filing an action against Defendants for violations of the False Claims Action, 31 U.S.C. § 3729 *et seq.*

300.   Supreme's termination of Mr. Epp and breach of the Termination Agreement constitute acts of discrimination against Mr. Epp in the terms and conditions of his employment.  Mr. Epp's refusal to perpetuate Supreme's violations of the False Claims Act, and his efforts to file an action against Supreme for such violations, constituted lawful acts in furtherance of an action under 31 U.S.C. § 3730.

301.   Thus, Defendants' actions amounted to discrimination in the terms and conditions of Mr. Epp's employment because of lawful actions in furtherance of an action under 31 U.S.C. § 3730.

302.   As a result of Defendants' violations of 31 U.S.C. § 3730(h), Mr. Epp  has been damaged in the amount of €800,000, together with interest and diminution in value due to exchange-rate fluctuations, from October 1, 2010, and other compensatory damages.

## COUNT IV

## BREACH OF CONTRACT

303.   The allegations of ¶¶ 1-302 are realleged as if fully set out herein.

304.   Michael Epp and some or all of the defendants entered into a contract, supported by adequate consideration, pursuant to which Defendant Supreme Food-service GmbH & Co.KG owed Michael Epp a payment of €400,000 on September 30, 2010.

305.   Defendants failed to make the required payment, and thereby breached its contract with Relator.

306.   Relator fully performed all obligations under the contract.

307.   Defendants owe Relator €400,000, together with interest from October 1, 2010.

**WHEREFORE**, Relator Michael Epp, on behalf of himself and the United States of America, prays:

A.   That the Court enter judgment against the Defendants, jointly and severally, in amount equal to three times the amount of damages the United States Government sustained because of their actions, plus a civil penalty of $11,000.00 for each false claim;

B.   That the Court enter judgment on Mr. Epp's behalf in the amount of 25% of the proceeds of this action if the United States elects to intervene, and 30% of the proceeds if it does not;

C.   That the Court enter judgment on Mr. Epp's claim pursuant to 31 U.S.C. § 3730(h) in the amount of double the sum wrongfully withheld by Supreme in

retaliation, together with compensatory damages, including damage resulting from variations in the monetary exchange rate;

D.     That the Court enter judgment on Mr. Epp's claim for breach of contract in the amount of €400,000, together with interest from October 1, 2010;

E.     That the attorney fees, expenses, and costs incurred on behalf of Mr. Epp be paid by defendants; and

F.     That the United States and Relator receive all legal and equitable relief to which they may appear entitled.

Respectfully submitted,

_____
Frederick M. Morgan, Jr.
Jennifer M. Verkamp
Sara Vann
Morgan Verkamp, LLC
700 Walnut Street, Suite 400
Cincinnati, OH 45202-2015
Tel (513) 651-4400
Fax (513) 651-4405
e-mail rick.morgan@morganverkamp.com

_____
Marc S. Raspanti, P.A.I.D. No. 41350
Michael A. Morse, P.A.I.D. No. 80507
Pietragallo Gordon Alfano
Bosick & Raspanti, LLP
Suite 3402
1818 Market St.
Philadelphia, PA 19103
Tel (215) 320-6200
Fax (215) 981-0082
e-mail msr@pietragallo.com

DO NOT SERVE